833 P.2d 222

**ROBERTS OIL COMPANY, INC. and Federated Service Insurance Company, Plaintiffs–Appellants,**

v.

**TRANSAMERICA INSURANCE COMPANY and CNA Insurance Company, Defendants–Appellees.**

**Nos. 19789, 19794.**

Supreme Court of New Mexico.

May 18, 1992.

Hinkle, Cox, Eaton, Coffield & Hensley, Thomas M. Hnasko, Joe W. Wood, Gary W. Larson, Santa Fe, for plaintiffs-appellants.

Civerolo, Hansen & Wolf, Terry R. Guebert, Albuquerque, Steven M. Crane, Los Angeles, Cal., for defendant-appellee Transamerica Ins. Co.

Hatch, Beitler, Allen & Shepherd, Bob Thorson, Kimberly A. Franklin, Albuquerque, for defendant-appellee CNA Ins. Co.

OPINION

MONTGOMERY, Justice.

This case, at least as argued by the parties, presents a conflict between basic principles of insurance law and the necessity for prompt remedial action to correct an instance of environmental contamination. As we view the case, these competing objectives can be harmonized by applying settled New Mexico law and fundamental concepts underlying the nature of an insurance contract.

The insurers defend two partial summary judgments relieving them of liability under their respective insurance policies for an incident of groundwater contamination that occurred several years before they were notified of the insured's claims against them and after the insured ·had

assumed substantial obligations and incurred significant expenses to remediate the contamination. The insured appeals from the summary judgments, arguing that, even if it breached a clause in the policies providing that it would not make such voluntary payments, the breach did not discharge the insurers absent prejudice to them. We basically agree with the insured's position (modified as discussed in this opinion), reverse the summary judgments, and remand the case for trial.

## I. FACTS AND ISSUES

### A. *The Leaded Gasoline Leak and the Insured's Steps to Abate It*

The contamination in question was discovered on January 21, 1985. It was occurring at a site in Albuquerque, New Mexico, which the insured, Roberts Oil Company, Inc. ("Roberts"), had leased as a Pump–N–Save filling station ("the site"). Roberts, a distributor and retailer of gasoline, had leased the site from Charles Bass in 1980, and Bass was operating the station by agreement with Roberts.

An underground transmission line running from leaded (regular) gasoline storage tanks to the dispensers at the pump islands had developed a leak sometime before January 1985, and the leaking gasoline had contaminated the groundwater beneath the site. Coincidentally, another underground gasoline leak had occurred at the site, apparently beginning sometime before 1980. This second (though earlier occurring) gasoline leak had led to the filing of a lawsuit by the Environmental Improvement Division of the New Mexico Health and Environment Department ("the EID") against Bass and Roberts in 1984. The leak which was the subject of this law suit was a release of *un*leaded gasoline that apparently occurred while Bass was operating the site as another brand of filling station. The EID's suit against Bass and Roberts was unrelated to the leaded gasoline leak discovered in January 1985, but Roberts was joined as a defendant on the theory that, by permitting the release of unleaded gasoline, Roberts was maintaining a public nuisance.

The EID suit over the unleaded gasoline leak was pending in January 1985 when the leaded gasoline leak was discovered. While responsibility for the earlier (unleaded) leak appears to have been directed primarily at Bass, the later (leaded) leak was regarded as primarily Roberts' responsibility. Roberts gave prompt notice of the leaded gasoline leak to the EID; and the EID, of course, demanded that Roberts abate the contamination resulting from the leak, under threat of litigation and sanctions pursuant to applicable statutes and regulations. Roberts also notified its then comprehensive general liability (CGL) insurer, Federated Service Insurance Company ("Federated"), which had undertaken Roberts' CGL insurance coverage effective January 1, 1985—twenty-one days before discovery of the leak. Federated began investigating the claim and designing and implementing a system to define the extent of groundwater contamination and to prevent further contamination. Roberts and Federated first notified Roberts' previous CGL carriers, Transamerica Insurance Company ("Transamerica") and CNA Insurance Company ("CNA"), of the problem on July 14, 1989. By that time Federated had spent in excess of $250,000 in abating the contamination and negotiating with the EID over the remediation project.

Meanwhile, the EID suit over the unleaded leak was settled as to Roberts in February 1986. The EID dismissed its claim against Roberts relating to the unleaded gasoline leak and agreed not to institute litigation over the leaded leak. In exchange, Roberts assumed responsibility for abating the leaded leak and agreed to undertake ongoing remedial activities at the site, including construction of wells to monitor and remove the groundwater contamination.

### B. *The Insurance Policies and the Insured's Claims Against the Insurers*

As already indicated, Roberts was insured under a CGL policy issued by Federated, effective January 1, 1985. Before that date, and beginning on January 5, 1981, Roberts' operations at the site were

insured under two successive CGL policies issued by Transamerica, providing coverage during the period January 5, 1981, to January 5, 1983. From January 1, 1983, to October 5, 1984, Roberts' insurance coverage was furnished by The Home Insurance Company ("The Home"), and from October 5, 1984, to January 1, 1985, its coverage was placed with CNA. Since, as will appear shortly, Roberts and Federated's claims against The Home were settled, we are concerned here only with the policies issued by Transamerica and CNA (to whom we shall sometimes refer as "the insurers"). Each of those policies insured against liability for property damage caused by an "occurrence," and each contained the following provisions pertinent to this appeal:

Under the heading "Insured's Duties in the Event of Occurrence, Claim or Suit," the policy provided that, in the event of an occurrence, written notice with respect to the circumstances of the occurrence would be given to the company by or for the insured "as soon as practicable." The policy then continued:

The insured shall cooperate with the company and, upon the company's request, assist in making settlements, [etc.] * * *. The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of accident.

We shall refer to this clause as the "voluntary payment" clause.

Immediately after the voluntary payment clause, under the heading "Action Against Company," appears what we shall refer to as the "no action" clause. It reads in pertinent part as follows:

No action shall lie against the company unless, as a condition precedent thereto, there shall have been full compliance with all of the terms of this policy, nor

until the amount of the insured's obligation to pay shall have been finally determined either by judgment against the insured after actual trial or by written agreement of the insured, the claimant and the company.

Sometime in late 1988 or early 1989, after the contamination had been abated, Federated began investigating the possibility that the leaded gasoline leak had occurred before January 1985, during the effective dates of insurance policies issued to Roberts by other carriers. According to an affidavit filed in the proceedings below, Roberts had no independent recollection of the carriers who had provided CGL insurance during the period 1981–1984 and no knowledge that a line leak during that period might entitle it to seek benefits under insurance policies previously in effect but then expired. Nevertheless, by July 14, 1989, attorneys retained by Federated had unearthed the insurance history recited above, and on that date the attorneys notified Transamerica, CNA, and The Home of claims for indemnity and contribution with respect to amounts Federated had expended on behalf of Roberts in connection with the pollution abatement project. The insurers did not respond (at least in writing) to the notices.

## C. The Proceedings Below

Roberts and Federated commenced this action against Transamerica, CNA, and The Home on November 15, 1989. The complaint sought a declaratory judgment that each of the defendants was obligated to indemnify Roberts and reimburse Federated for amounts expended in abating the contamination and in defending against the claims of the EID or, alternatively, for contribution to Federated's payment of such amounts.[1] Each defendant answered, denied liability, and raised various affirmative defenses.

1. Federated sought reimbursement from the other carriers on the theory that an "other insurance" clause in its policy meant that its liability to its insured, Roberts, was secondary and the liability of the others was primary. Federated's alternative claim for contribution was based on the theory that, if all carriers shared liability equally, the liability should be prorated on some basis, such as the policy limits under each carrier's policy as a proportion of the aggregate policy limits. No issue as to the type of relief to which Federated may be entitled if it prevails in this action is involved in this appeal.

After filing the complaint, Roberts and Federated continued negotiations with the EID regarding ongoing remediation at the site. Federated informed Transamerica and CNA of these negotiations, but the defendants declined to participate in them. In June 1990, Roberts and Federated executed a second agreement with the EID, under which they agreed to transfer the remediation system to the EID and to pay it $45,000 in exchange for a complete release of their environmental cleanup obligations at the site. As of that date, Federated had spent approximately $504,000 in defense and cleanup costs on behalf of Roberts.

In July 1990, Federated and Roberts settled their claims against The Home and dismissed it from the lawsuit.

On November 1, 1990, Transamerica moved for partial summary judgment, requesting an adjudication that it was not liable for any amounts expended or obligations assumed by Roberts and Federated before they provided notice to Transamerica. The motion was based on the grounds that Roberts had breached the voluntary payment and no action clauses in the Transamerica policies and that, in any event, Transamerica was not liable for any costs incurred or obligations assumed prior to notice and tender of the defense.[2] Transamerica attached to its motion affidavits and other materials setting out the history recited above and took the position (which it maintains on this appeal) that, because Roberts had breached its obligations under the voluntary payment and no action clauses, any liability that Transamerica might otherwise have under its CGL policies was discharged to the extent that such liability related to costs incurred or obligations assumed before Roberts notified it of the "occurrence" at the site and of the EID's claims.

Roberts and Federated responded to Transamerica's motion with a cross-motion for partial summary judgment, requesting an adjudication that Transamerica had "suffered no conceivable prejudice, as a matter of law," from their delay in notifying Transamerica and that the voluntary payment and no action provisions in the policies were not applicable to the case. Roberts and Federated further requested that they be permitted to proceed to trial, at which, presumably, Transamerica's liability for damages occurring during the effective dates of its policies would be established and the availability to Transamerica of any of its other defenses would be decided. Attached to this motion were various affidavits and other documents, including an affidavit from John Stevenson, the president of an environmental consulting firm, who testified that Roberts and Federated's actions in decontaminating the groundwater had been a prudent, economical, and effective response to the contamination problem resulting from the leaded gasoline leak. Stevenson's affidavit supported Roberts and Federated's position that Transamerica and CNA had suffered "no conceivable prejudice" as a result of Roberts and Federated's actions and, in fact, had benefitted significantly by their timely and prudent response to the gasoline leak.

Transamerica responded to Roberts and Federated's cross-motion with an affidavit of one of its attorneys, who averred (without establishing that he had the personal knowledge required by SCRA 1986, 1–056(E) (Cum.Supp.1991)) that, had Transamerica received earlier notice, it could have investigated the physical evidence to support its defense that the pollution exclusion in its policies applied and to determine whether any covered property damage had in fact occurred during the policy periods. The attorney also swore: "There may be other reasons why Roberts' failure to notify Transamerica was prejudicial, and discovery is necessary to determine such other further bases for prejudice."

In a letter to the parties dated January 4, 1991, the district court ruled in Transamerica's favor. The court held that Rob-

---

**2.** This latter defense was based, *inter alia*, on *State Farm Fire & Casualty Co. v. Price*, 101 N.M. 438, 443, 684 P.2d 524, 529 (Ct.App.) ("[B]efore the duty to defend arises there must be a demand."), *cert. denied,* 101 N.M. 362, 683 P.2d 44 (1984).

erts had breached the voluntary payment clause in Transamerica's policies, that this "had the effect of depriving Transamerica of its contractual right to control the defense [to the EID's claims,]" and that Roberts and Federated's claim "that Transamerica benefitted because of their efficiency in resolving the dispute [with the EID]" was speculation. The court embodied its ruling in a final judgment, entered February 18, 1991, granting Transamerica's motion for partial summary judgment; denying Roberts and Federated's cross-motion; declaring that Roberts and Federated were not entitled to recover from Transamerica any costs, expenses, or obligations incurred by them before providing notice to Transamerica; and certifying the judgment as final under SCRA 1986, 1–054(C). Roberts and Federated (to whom we shall sometimes refer as "the appellants") timely filed a notice of appeal to this Court.

As for CNA, shortly after the trial court issued its letter ruling of January 4, 1991, CNA filed its own motion for partial summary judgment, based on grounds identical to those asserted by Transamerica. After the court entered its judgment in favor of Transamerica on February 18, Roberts and Federated agreed to a stipulated partial summary judgment in favor of CNA, under which a final judgment, identical in form and substance to the judgment in favor of Transamerica, was entered in favor of CNA. The appellants filed a notice of appeal from this judgment, and we consolidated the two appeals.

### D. *The Issues on Appeal*

Roberts and Federated seek to reverse the partial summary judgments against them by asserting four points: (1) The district court erred in not applying the rule requiring substantial prejudice to the insurer before the insurer can escape liability because of the insured's breach of a clause similar to the voluntary payment clause in this case; (2) Transamerica and CNA forfeited any right to deny policy benefits by failing to respond, or responding inadequately, to Roberts and Federated's notices when the notices were finally sent in mid-1989; (3) the voluntary payment clause does not apply because Roberts and Federated were not "volunteers" and because Federated's payments on behalf of Roberts were made under compulsion of law; and (4) the no action clause does not apply because the clause only prevents an action by a third-party claimant against the insurer and has no applicability to an action by the insured. In disposing of the appeal, we find it necessary to decide only the first issue, although in doing so we shall comment briefly on the applicability of the no action clause and the "voluntariness" of Federated's payments.

With respect to appellants' "forfeiture" argument—*i.e.*, that the insurers lost their right to assert various defenses when they did not respond in a timely and adequate manner to Roberts and Federated's notices [3]—we think that the appellants misapprehend the thrust of the trial court's partial summary judgments. The court's judgments do not declare complete nonliability in favor of the insurers; indeed, the extent of the insurers' liability is presumably an issue that remains open for trial, except to the extent foreclosed by the judgments. Admittedly, the judgments dispose of the lion's share of appellants' claims against the insurers, ruling as they do that "[a]ny obligation undertaken or costs incurred by [appellants] prior to providing notice to [the insurers] were voluntarily undertaken and are their own liability and are not recoverable from [the insurers]." As best we can tell, this rules out all of Federated's expenditures except the $45,-000 settlement with the EID in June 1990. All other expenditures appear to have been incurred either through payments made before notice was given in July 1989 or as a result of obligations assumed in Roberts'

---

**3.** The argument is based on *State Farm Fire & Casualty Co. v. Price, supra* note 2, 101 N.M. at 445, 684 P.2d at 531 ("When an insurance company fails to defend after a demand, it suffers serious consequences. These consequences include loss of the right to claim that the insured breached policy provisions, * * * the right to claim that the insured did not cooperate, and the right to claim that the insured settled without its consent." (citations omitted)).

settlement agreement with the EID in February 1986. The court's partial summary judgments thus relate to expenses incurred or obligations assumed *before* the insured's notice to the insurers, while the appellants' forfeiture argument relates to the insurers' conduct *after* notice. We conclude, therefore, that the appellants' argument that the insurers forfeited their right to assert defenses because of their conduct after receiving notice is irrelevant to the trial court's partial summary judgments.

We also wish to make clear the narrow scope of our disposition of this appeal. Potentially, many issues could arise during the trial of this action, while the court is *en route* to an adjudication of the insurers' liability or nonliability to reimburse, or contribute to, Federated's expenditures on behalf of Roberts. The trial court's only ruling in entering its partial summary judgments was that there was no genuine issue of fact that Roberts had breached the voluntary payment clause and that, accordingly, each insurer was entitled to partial judgment as a matter of law. The correctness of that ruling is the only issue we address in this opinion. Other issues that may arise include the one alluded to above—the nature of the relief to which Federated will be entitled if the court rules in its favor: reimbursement or contribution. Another issue, mentioned in the briefs but not discussed because it was not ruled on below, is the applicability of one or more exclusions in the policies, such as the exclusion for "property damage arising out of the discharge * * * [or] release * * * of * * * contaminants or pollutants into * * * any water course or body of water." There may also be issues as to whether the leaded gasoline contamination caused "property damage," whether the gasoline leak was an "occurrence," and probably other issues not even appearing from the briefs in this still developing dispute set in a field of law that is evolving almost day by day. *See, e.g., Avondale Indus., Inc. v. Travelers Indem. Co.,* 887 F.2d 1200 (2d Cir.1989), *cert. denied,* 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990); *Chemical Applications Co. v. Home Indem. Co.,* 425 F.Supp. 777 (D.Mass.1977); *Lido Co. v. Fireman's Fund Ins. Co.,* 574 A.2d 299 (Me.1990); *Compass Ins. Co. v. Cravens, Dargan & Co.,* 748 P.2d 724 (Wyo.1988); *see generally AIU Ins. Co. v. Superior Court,* 51 Cal.3d 807, 274 Cal.Rptr. 820, 799 P.2d 1253 (1990) (in bank) (involving coverage under CGL policy for environmental cleanup measures). Disposition of any and all such issues must await further proceedings in the trial court.

## II. THE GOVERNING LEGAL PRINCIPLES

### A. *The Requirement of Substantial Prejudice (Foundation Reserve v. Esquibel)*

Although no New Mexico decision has yet ruled upon the effect of a breach of a voluntary payment provision in an insurance policy, we are not without significant guidance in resolving this question. In *Foundation Reserve Insurance Co. v. Esquibel,* 94 N.M. 132, 607 P.2d 1150 (1980), we held that an insurer "must demonstrate substantial prejudice as a result of a material breach of the insurance policy by the insured before it will be relieved of its obligations under a policy." *Id.* at 134, 607 P.2d at 1152. The particular provisions in the policy at issue in *Esquibel* were clauses providing that the policy would be voided if the insured failed to notify the insurer of an accident, failed to cooperate in defending or settling a claim, or willfully concealed material facts concerning a claim. *Id.* at 133, 607 P.2d at 1151. This Court found, and apparently it was undisputed, that the insured's breach of these provisions was a substantial and material one. *Id.* Nevertheless, the Court went on to consider "whether we require that [the insurer] demonstrate substantial prejudice as a result of this material breach." *Id.* at 134, 607 P.2d at 1152. As just noted, we answered this question affirmatively, and affirmed the trial court's finding (as supported by substantial evidence) that the insurer had not been substantially prejudiced by the breach and that, accordingly, the insurer was liable to defend and indemnify the insured against a third party's

claim for damages sustained in an automobile accident.

Recognizing the precedential effect of *Esquibel*, Transamerica and CNA attempt to distinguish it on various grounds. They first seize on the following language in the opinion, which they characterize as the "underlying rationale" of the holding: "The risk-spreading theory of liability 'should operate to afford to affected members of the public—frequently innocent third persons—the maximum protection possible consonant with fairness to the insuror.'" *Id.* at 134, 607 P.2d at 1152 (quoting *Oregon Auto. Ins. Co. v. Salzberg,* 85 Wash.2d 372, 535 P.2d 816, 819 (1975)). In its letter decision informing the parties that it would grant Transamerica's motion for partial summary judgment, the trial court in the present case seized on this same language, saying that "the 'prejudice' rule would not be extended to the present dispute because no 'innocent third party' is injured."

We think that the rationale behind *Esquibel* cannot be limited so narrowly. At the beginning of that opinion, we stated the issue as follows: "Is a substantial and material breach of the insurance contract by the insured sufficient to void his policy, or must the insuror also demonstrate actual prejudice to the insuror resulting from the breach?" 94 N.M. at 132, 607 P.2d at 1150. There is no indication in the opinion, nor any in the many other cases requiring a showing of actual prejudice, that the rule operates only when an innocent third party is or has been injured. Rather, the rule implements a fundamental characteristic of all, or nearly all, insurance contracts—namely, the essential nature of the contract as a promise by the insurer to indemnify and defend the insured against certain risks, in exchange for the insured's payment of the premium. We shall return to this characteristic shortly.

B. *The Purpose of the Voluntary Payment Clause: Protection of the Insurer's Interests (Estes v. Alaska Insurance; Sanchez v. Kemper Insurance)*

Transamerica and CNA also attempt to distinguish *Esquibel* by characterizing the policy provisions at issue in that case as "cooperation" provisions and arguing that, while a showing of prejudice may be required to relieve an insurer when the insured breaches a cooperation provision, such a showing is not necessary when the insured breaches other provisions, such as the voluntary payment and no action provisions in this case. We think this distinction is one without a difference. As the Supreme Court of Alaska said recently:

In *Zuckerman v. Transamerica Insurance Co.,* [133 Ariz. 139], 650 P.2d [441 (1982)] at 448, the Arizona Supreme Court held that a contractual modification of the statute of limitations should be enforced only 'when the reasons for its existence are thereby served.' When enforcement does not serve the reasons for the provision's inclusion in the policy, the insured's reasonable expectation that coverage will not be arbitrarily denied must be given effect. *Id.* In short, the authority of the provision is limited by the reality of the way insurance policies are bought and sold; the effect of the provision is limited by the reasonable expectations of the insured.

We hold that time limit on commencement of suit clauses, notice of loss clauses, proof of loss clauses, and cooperation clauses should all be reviewed on the basis of whether their application in a particular case advances the purpose for which they were included in the policy. Only by so reviewing these clauses can courts satisfy the consumer's reasonable expectation that coverage will not be defeated on arbitrary procedural grounds.

*Estes v. Alaska Ins. Guar. Ass'n,* 774 P.2d 1315, 1318 (Alaska 1989).

In *Estes,* the Alaska court noted that a number of other courts, including this one, had upheld a distinction between time-to-sue clauses and notice clauses, citing this Court's decision in *Sanchez v. Kemper Insurance Cos.,* 96 N.M. 466, 632 P.2d 343 (1981). *Estes,* 774 P.2d at 1318 n. 3. In view of what we say today and our approval of the reasoning in *Estes,* the distinction in *Sanchez* between a time-to-sue limitation provision and a notice clause (and other

similar clauses as listed in *Estes*) is now open to serious question.

The court in *Estes* was correct in focusing on the purpose of the particular clause in question and inquiring whether that purpose will be advanced by applying it to the dispute in a given case. This Court in *Sanchez* undertook this same type of analysis, finding that the purpose of a cooperation clause is to prevent collusion between the insured and the injured, as well as to make possible the insurer's investigation. *Sanchez*, 96 N.M. at 468, 632 P.2d at 345. Relying on *Esquibel*, the Court continued: "Since the reason for such a clause is fear of prejudice to the insurer, it is reasonable to require a showing of prejudice." *Id.* However, the Court then went on to distinguish the policy considerations underlying a time-to-sue provision from those underlying a cooperation clause. The former set of considerations, we said, include the public interest in prompt assertion of legal claims, the possibility of fraudulent claims if a long period elapses between the occurrence and the initiation of a claim, allowing an insurer to avoid uncertainty as to the amount of its liability, and permitting stale claims to be cut off. *Id.* at 467, 632 P.2d at 344. But these considerations either duplicate those underlying a cooperation clause (preventing fraud or collusion and protecting the insurer's interests) or replicate policies behind the statute of limitations (encouraging prompt assertion of legal claims and cutting off stale claims). When a contractual modification of the statute of limitations is truly bargained for, there may be good reason to enforce the bargain; but, as several courts have noted, when such provisions appear in contracts of adhesion like insurance policies, their enforcement, as the court in *Estes* observed, will probably frustrate "the consumer's reasonable expectation that coverage will not be defeated on arbitrary procedural grounds."

■ Similarly, in the present case, we do not believe that the policy considerations underlying a voluntary payment provision differ significantly from the policy considerations underlying a cooperation clause.

The purposes of a voluntary payment provision are to "obviate the risk of a covinous or collusive combination between the assured and the injured third party" and to "restrain the assured from voluntary action materially prejudicial to the insurer's contractual rights." *Kindervater v. Motorists Casualty Ins. Co.*, 120 N.J.L. 373, 199 A. 606, 608 (1938). *See also Augat, Inc. v. Liberty Mut. Ins. Co.*, 410 Mass. 117, 571 N.E.2d 357, 361 (1991) (purpose of voluntary payment clause is to give insurer opportunity to protect its interests); *Coil Anodizers, Inc. v. Wolverine Ins. Co.*, 120 Mich.App. 118, 327 N.W.2d 416, 418 (1982) (purpose of voluntary payment provision is to prevent collusion between the claimant and the insured and to give the insurer control over settlement negotiations). These purposes achieve the same general objectives as the purposes of a cooperation clause. *Kindervater*, 199 A. at 608. Thus, we reject Transamerica and CNA's attempt to distinguish this case from *Esquibel*.

And, while we agree with the *Sanchez* approach of focusing on the purpose of the contractual provision at issue, we question the Court's analysis of the relevant considerations underlying the respective policy provisions. The present case does not involve a time-to-sue clause, so there is no occasion to overrule *Sanchez;* but, as indicated, we think its result and some of its rationale are questionable.

C. *The "Agreed Exchange" in an Insurance Policy (Aetna Casualty v. Murphy)*

Another relatively recent case adopting the functional approach followed in *Sanchez* (though not, we have intimated, correctly applied) and in *Estes* is *Aetna Casualty & Surety Co. v. Murphy*, 206 Conn. 409, 538 A.2d 219 (1988). That case involved an insured's inexcusable and unreasonable delay in giving notice to his comprehensive liability insurer of a claim asserted by a third party. The court held that, despite the insured's delay in giving notice, the insurer was not automatically discharged from liability because:

"The purpose of a policy provision requiring the insured to give the company prompt notice of an accident or claim is to give the insurer an opportunity to make a timely and adequate investigation of all the circumstances." * * * If this legitimate purpose can be protected by something short of automatic enforcement of the notice provisions, then their strict enforcement is unwarranted.

In our judgment, a proper balance between the interests of the insurer and the insured requires a factual inquiry into whether, in the circumstances of a particular case, an insurer has been prejudiced by its insured's delay in giving notice of an event triggering insurance coverage. If it can be shown that the insurer suffered no material prejudice from the delay, the nonoccurrence of the condition of timely notice may be excused because it is not, in Restatement terms, "a material part of the agreed exchange." Literal enforcement of notice provisions when there is no prejudice is no more appropriate than literal enforcement of liquidated damages clauses when there are no damages.

*Id.* 538 A.2d at 223 (quoting 8 John & Jean Appleman, *Insurance Law and Practice* § 4731, at 2–5 (rev. ed. 1981), and *Restatement (Second) of Contracts* § 229 (1979)).[4]

In developing the foregoing rationale, the Supreme Court of Connecticut relied on three considerations, which it characterized as central. First, and as we have already noted, an insurance policy is a contract of adhesion; second, enforcement of a notice provision operates as a forfeiture because the insured loses his insurance coverage without regard to his dutiful payment of insurance premiums; and third, the insurer's legitimate purpose of guaranteeing itself a fair opportunity to investigate accidents and claims can be protected without the forfeiture resulting from an irrebuttable presumption that late notice invariably prejudices the insurer. *Id.* at 222. While we agree that all of these considerations

are important, we are particularly struck by the second—the recognition that the insured forfeits coverage without regard to his payment of premiums even though, in the words of the *Restatement,* occurrence of the condition is not "a material part of the agreed exchange."

This consideration evokes the nature of an insurance contract as an "aleatory" contract, in which each party's promise (in the case of a bilateral contract) or the insurer's promise (in the case of a unilateral contract) is independent of, and not bargained in exchange for, the other party's promise or performance of some undertaking. We very recently considered some of the attributes of an aleatory contract in the context of a life insurance policy, *Jackson National Life Insurance Co. v. Receconi,* 113 N.M. 403, 411, 827 P.2d 118, 126 (1992); and the CGL policies issued by the insurers in this case are no different in terms of their fundamental nature as aleatory contracts. In the policies in this case, the insurers' promises, which were given in exchange for Roberts' premium payments, were to indemnify and defend the insured against liability for property damage and were conditioned on the occurrence of a fortuitous event—namely, an occurrence (or series of occurrences) that might result in Roberts' liability for causing damage to others' property. *See id.* at 410 & n. 7, 827 P.2d at 125 & n. 7.

Because the insurance contracts at issue in this case were aleatory, we regard as misplaced the insurers' insistence that Roberts' breach of the voluntary payment clauses discharged them as a matter of law. In an aleatory contract which is bilateral (in some respects at least, as when the insured promises not to voluntarily assume obligations or incur expenses), a breach by the insured of an obligation that is not, in *Restatement* terms, "a material part of the agreed exchange" will not discharge the insurer from *its* obligation (to pay and defend in the event the insured risk occurs).

---

**4.** The court in *Murphy* nevertheless upheld a summary judgment in favor of the insurer because the insured's affidavit opposing summary judgment contained no factual basis for his

claim that the insurer had not been materially prejudiced by the delay in giving notice. 538 A.2d at 224.

In the context of standard-form CGL policies, offered to insureds like Roberts on a take-it-or-leave-it basis, it is absurd to assert, as Transamerica does, that Roberts' promise not to make a voluntary payment was part of the agreed exchange. The agreed exchange was Roberts' payment of the premium, for which it received Transamerica's promise to defend and indemnify it if the insured risk materialized.

If, in a bilateral aleatory contract like the CGL policies in this case, performance of the insured's promise is made an express condition to performance of the insurer's promise, then the insurer has a better argument that its duty is discharged upon the nonoccurrence of that express condition. *See Jackson*, 113 N.M. at 411, 827 P.2d at 126 (citing 3A Arthur L. Corbin, *Corbin on Contracts* § 730, at 415–16 (1960)). That appears to be one of the purposes of the no action clause relied upon by the insurers in this case—a clause which, as Transamerica argues, is "complementary" to the voluntary payment clause. The first part of the no action clause makes full compliance with all of the policy terms a condition precedent to an action against the company, and we are willing for purposes of this case to accede to the insurers' argument that the no action clause does indeed convert the voluntary payment clause from a promise by the insured to an express condition to the insurer's obligations. *See Mountainair Mun. Sch. v. United States Fidelity & Guar. Co.*, 80 N.M. 761, 764, 461 P.2d 410, 413 (1969) (no action clause made insured's compliance with all policy terms a condition precedent to any action against the insurer).

Nevertheless, while, as *Mountainair* holds and as we later discuss, the insured's failure to comply with the policy terms and the resulting nonoccurrence of a condition precedent may give rise to a presumption of prejudice to the insurer, the presumption is rebuttable. *Id.* Rebutting it can be achieved by producing evidence that the insurer was not in fact prejudiced. So we hold, applying *Esquibel* and *Mountainair*, that even when there has been a substantial and material breach of the insured's obligation and a resulting failure of a condition precedent to the insurer's liability, that breach and nonoccurrence of condition does not discharge the insurer absent a showing that the insurer has been substantially prejudiced.

### D. *Lack of Genuine Issue That Insurer Was in Fact Prejudiced (Augat v. Liberty Mutual)*

The foregoing holding is to a considerable extent inconsistent with a recent ruling by the Supreme Judicial Court of Massachusetts in a case quite similar on its facts to this one, *Augat, Inc. v. Liberty Mutual Insurance Co.*, 410 Mass. 117, 571 N.E.2d 357 (1991). There, a water treatment system operated by the insured failed and released contaminated water into a sewer system and the ground at the site. The state threatened to sue the insured and seek substantial statutory penalties, and the insured signed a consent order under which it agreed to decontaminate the site at its own expense. It did so, incurring over a million dollars in cleanup costs, following which it requested reimbursement from its insurer under a CGL policy; it also requested that the insurer acknowledge liability for an additional $3.85 million in anticipated expenses. The insurer declined coverage and the insured sued. The trial court entered a summary judgment in favor of the insurer, and the supreme judicial court affirmed.

As is true in the present case, and probably for the same reason, the insurer did not rely on the policy provision requiring prompt notice of a claim; it was well established in Massachusetts, as it is in New Mexico, that a delay in giving notice of a claim is not a defense available to an insurer unless the insurer can demonstrate that it has been prejudiced by the delay. *Id.* 571 N.E.2d at 359. Instead, the insurer relied on the insured's breach of the voluntary payment clause, which was identical to the clause in this case. The insured argued (as the appellants do here) that its agreement with the state was not "voluntary" and that the insurer was required to demonstrate prejudice before it was allowed to deny coverage. *Id.* at 360.

The supreme judicial court disagreed. On the question of voluntariness, the court held that, while the insured's action was not entirely free from outside influence, it was "voluntary" in the sense of "by an act of choice," because the insured had an alternative—the right to demand that the insurer defend the state's claim and assume the obligation to pay for the cleanup. *Id.* For the same reason, we cannot hold in this case that Roberts was not acting voluntarily; we assume for purposes of this decision (though we do not decide the point) that Roberts had the same choice as the insured in *Augat*—to make demand on all its insurers from 1981 forward and let them fight out who owed what in terms of cleanup costs.[5] On the issue of whether the insurer is required to demonstrate prejudice, however, we take a different approach than that adopted by the Massachusetts court.

The court followed much of the functional analysis employed earlier in this opinion: It focused on the purpose of the voluntary payment provision, which it found was to give the insurer an opportunity to protect its interests. *Id.* at 360 n. 4, 361. The court reasoned that, as we have indicated, this purpose is shared by other similar policy provisions—notice, consent-to-settlement, and cooperation provisions—and that a violation of such a provision should bar coverage only when the breach frustrates the purpose underlying the provision. *Id.* at 361. The court also emphasized the adhesive nature of an insurance contract, which it said was "not a negotiated agreement; rather its conditions are by and large dictated by the insurance company to the insured." *Id.*

Nevertheless, the court ruled that the insured's breach of the voluntary payment provision undermined the purpose of the provision:

> After Augat agreed to a settlement, entered into a consent judgment, assumed the obligation to pay the entire cost of the cleanup, and in fact paid a portion of that cost, it was too late for the insurer

to act to protect its interests. There was nothing left for the insurer to do but to issue a check.

*Id.*

We view the decision in *Augat* as resting on a holding that, on the record in that case, there was no genuine issue of fact that the insurer had suffered substantial prejudice and that, accordingly, the insurer was entitled to judgment as a matter of law. We do not regard the case as holding that, as a matter of law, the insurer invariably and inevitably suffers prejudice when the insured breaches a voluntary payment provision. The court could have done what we do in this case—reverse the summary judgment and remand the case for trial on the issue of prejudice; but apparently the court believed that the record did not give rise to an issue of fact as to whether the insurer had suffered prejudice. Here, for the reasons we shall outline below, we think the record does indeed create a genuine issue of this fact.

E. *The Presumption of Prejudice and the Burden of Proof (Rule 11–301)*

■ Before applying the principles discussed thus far in this opinion, we take up one issue, already alluded to, that frequently will arise when a court must decide whether an insured's breach of policy provisions like those referred to in this opinion has prejudiced the insurer. That issue is where the burden of proof lies and how the presumption of prejudice, already mentioned, affects that burden.

The courts seem fairly uniform in agreeing that when an insured breaches one of these policy provisions, a presumption of prejudice to the insurer arises. We have already cited our own *Mountainair* case in this connection. *See also, e.g., National Gypsum Co. v. Travelers Indem. Co.*, 417 So.2d 254, 256 (Fla.1982) ("When notice of a possible claim is not given to an insurance company, prejudice is presumed * * *."); *Henderson v. Hawkeye–Security*

5. This assumption would not seem to ensure a very prompt response to an instance of ongoing environmental contamination. Nevertheless, we are willing to indulge it for present purposes, because our ruling on the issue of prejudice is dispositive of this appeal.

*Ins. Co.,* 252 Iowa 97, 106 N.W.2d 86, 91 (1960) ("[O]nce the unexcused breach has been found and not waived, prejudice should be presumed."); *Zurich Ins. Co. v. Valley Steel Erectors, Inc.,* 13 Ohio App.2d 41, 233 N.E.2d 597, 599 (1968) ("Prejudice to an insurer is presumed from unreasonable delay in giving the required notice of loss under the policy * * *." (quoting *Security Ins. Co. v. Snyder–Lynch Motors, Inc.,* 183 Cal.App.2d 574, 7 Cal.Rptr. 28 (1960)); *Ehlers v. Colonial Penn Ins. Co.,* 81 Wis.2d 64, 259 N.W.2d 718, 721 (1977) ("By placing the burden of proof upon the person claiming liability [a statute] has generally been viewed as creating a presumption of prejudice because of untimely notice.").

At the same time, while there may be near-unanimity that prejudice is presumed, there is no consensus as to where the ultimate burden of persuasion lies. *Compare Murphy,* 538 A.2d at 223 (most decisions that require showing of prejudice following breach of notice provision place burden of proof on insurer) (dictum) *and Augat,* 571 N.E.2d at 361 (insurer seeking to disclaim liability because of breach of notice, consent-to-settlement, and cooperation provisions must demonstrate that breach actually prejudiced its position) *and Brakeman v. Potomac Ins. Co.,* 472 Pa. 66, 371 A.2d 193, 198 (1977) (placing burden of showing prejudice on insurer) *with Murphy,* 538 A.2d at 224 (holding that insured must bear burden of establishing lack of prejudice) *and National Gypsum,* 417 So.2d at 256 (recovery not precluded if insured can demonstrate lack of actual prejudice) *and Zurich Ins. Co.,* 233 N.E.2d at 598 (burden rests on claimant to show absence of prejudice) *and Ehlers,* 259 N.W.2d at 721 (once insurer establishes it did not receive notice as soon as possible, burden shifts to claimant to prove insurer was not prejudiced by untimely notice).

> Under our Rules of Evidence,
>
> a presumption imposes on the party against whom it is directed the burden of going forward with evidence to rebut or meet the presumption, but does not shift to such party the burden of proof in the sense of the risk of nonpersuasion, which

remains throughout the trial upon the party on whom it was originally cast. SCRA 1986, 11–301. This rule eliminated the "bursting bubble" theory of presumptions, and a presumption now retains evidentiary effect throughout the trial, so as to permit the fact finder to draw an inference of the presumed fact from proof of the basic or predicate fact. *See Mortgage Inv. Co. v. Griego,* 108 N.M. 240, 243–44, 771 P.2d 173, 176–77 (1989). Therefore, in the present case, proof that Roberts voluntarily assumed obligations and incurred expenses gives rise to a presumption that Transamerica and CNA were prejudiced. That presumption will permit the fact finder to infer that they were in fact prejudiced, but the burden of persuasion of that fact will remain on the party on whom it is originally cast.

On whom should the burden of persuasion to show prejudice or its absence be cast? We believe that current New Mexico law answers this question and that the answer makes sense in light of relevant policy considerations. The answer provided by *Esquibel* is:

> The weight of authority and the trend nationally is to adopt the standard of substantial prejudice to the insuror. Recent decisions hold that this prejudice may be advanced as an affirmative defense to claims by the insured or third parties, *with the burden of proof resting on the insurance company.*
>
> \*  \*  \*  \*  \*  \*
>
> We hold that the insuror *must demonstrate* substantial prejudice as a result of a material breach of the insurance policy by the insured before it will be relieved of its obligations under a policy.

94 N.M. at 134, 607 P.2d at 1152 (emphasis added; citations omitted). *See also Worthey v. Sedillo Title Guar., Inc.,* 85 N.M. 339, 342, 512 P.2d 667, 670 (1973) (burden on title insurance company to establish actual prejudice and extent of such prejudice); *Price, supra* note 2, 101 N.M. at 444, 684 P.2d at 530 (insurance company seeking to avoid obligation under policy by claiming insured materially breached policy

provisions must demonstrate substantial prejudice as result of breach); *Yarbrough v. State Farm Ins. Co.*, 730 F.Supp. 1061, 1065 (D.N.M.1990) ("A number of courts have recently held that the burden of proof to establish prejudice is on the insurance provider.").

As indicated, we believe that this assignment of the burden of persuasion is justified from a policy standpoint. The purpose of the voluntary payment clause is to protect the insurer's interest in investigating the circumstances of the loss, directing the defense to the claim, participating in any settlement, controlling the costs in remediating the loss, etc. When that purpose is frustrated by the insured's breach of the clause, it makes sense to relieve the insurer of liability. On the other hand, when the insurer is not disadvantaged by the insured's conduct, then there is no reason to excuse the insurer from its promise to indemnify the insured against the monetary consequences of the loss and defend the insured against assertion of the claim. Since it is the insurer who is seeking to be excused from this aleatory promise, the insurer should, in the words of Rule 301, bear the "risk of nonpersuasion" that the insured's conduct prejudiced the insurer.

### III. APPLICATION OF THE PRINCIPLES

■ The attachments to Transamerica's motion for partial summary judgment established that Roberts had voluntarily made payments, assumed obligations, and incurred expenses following its discovery of the leaded gasoline leak in January 1985 and before notice to Transamerica and CNA in July 1989. This was sufficient to give rise to a presumption that Transamerica and CNA had been prejudiced by Roberts' breach of the voluntary payment clause. That presumption imposed on Roberts and Federated the burden of producing evidence to rebut or meet it. They did this by submitting John Stevenson's affidavit that their response to the environmental contamination had been cost-effective and beneficial to the insurers. The trial court, in its letter decision to the parties, charac-

terized this evidence as "speculation"; but it was no less speculative than Transamerica's attorney's counter-affidavit that, had Transamerica been notified earlier, it could have investigated the physical evidence to determine whether the pollution exclusion applied and whether any covered property damage had occurred during its policy period. Suffice it to say that the affidavits, together with the evidentiary effect of the presumption, combined to create factual issues that could only be resolved by a trial.

Appellants request that the trial court be reversed, not only in granting the insurers' motions for partial summary judgment, but also in denying appellants' own cross-motion for partial summary judgment. That motion, however, viewed realistically, was really more a response to the insurers' motion than a cross-motion seeking summary judgment in appellants' own favor. In light of the presumption directed against them, in light of the delay of over four years from discovery of the gasoline leak to notification of the insurers, and in light of the substantial obligations assumed and expenses incurred more than three years before the insurers were notified, appellants can hardly claim with a straight face, as they did in their cross-motion, that the insurers "suffered no conceivable prejudice, as a matter of law."

In resuming the proceedings below, the trial court will consider not only the coverage questions mentioned earlier in this opinion and the extent to which Roberts and Federated's settlement agreements with the EID either benefitted or disadvantaged the insurers, but also the question whether, and the extent to which, the appellants' early actions prevented the insurers from investigating the physical facts and defending against the EID's claims. These questions cannot be resolved as a matter of law. Even after the passage of so much time, there might be more than enough information still available for the court to determine whether, had the insurers been notified more promptly, they would have performed any differently. *Cf. Yarbrough v. State Farm Ins. Co.*, 730 F.Supp. at 1065 ("[A] more than adequate

defense might easily be provided through the use of accident reports, prior investigations, interviews and statements already taken in the progressive settlements which preceded the filing of this cause."). And the court should weigh the evidence on these points in light of the necessity for, and the public policy favoring, a prompt and effective response to an instance of environmental contamination.

The partial summary judgments are reversed, and the cause is remanded for further proceedings consistent with this opinion.

IT IS SO ORDERED.

RANSOM, C.J., and FRANCHINI, J., concur.