**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 2 2000**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

STATE OF WYOMING, through the
DEPARTMENT OF
ENVIRONMENTAL QUALITY, as
Subrogee of Montana Petroleum
Marketing Company,

       Plaintiff - Appellant,

v.

FEDERATED SERVICE
INSURANCE COMPANY, a
Minnesota corporation,

       Defendant - Appellee.

---

WYOMING ASSOCIATION OF
MUNICIPALITIES; WYOMING
COUNTY COMMISSIONERS
ASSOCIATION; UNITED
POLICYHOLDERS; THE
INSURANCE ENVIRONMENTAL
LITIGATION ASSOCIATION
("IELA"),

       Amici Curiae.

No. 98-8096
(D.C. No. 98-CV-48)
(District of Wyoming)

---

**ORDER AND JUDGMENT**[*]

---

   [*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. This court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Before **LUCERO**, Circuit Judge, **MCWILLIAMS**, Senior Circuit Judge, and **BROWN**[**], Senior District Judge.

In this diversity suit, the State of Wyoming, as the subrogee of Montana Petroleum Marketing Company, seeks indemnification from Federated Service Insurance Company, Montana Petroleum's insurer, for past and future costs associated with the remediation of an oil spill on Montana Petroleum's property. The district court granted summary judgment in favor of Federated, and subsequently denied Wyoming's motions for a new trial, alteration or amendment of the judgment, and correction of the order. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

## I

In the Spring of 1985, the Wyoming Department of Environmental Quality ("WDEQ") discovered petroleum discharges into Clear Creek in Buffalo, Wyoming, and traced the discharge to a truck stop operated by Montana Petroleum. Testing conducted at WDEQ's request revealed leaks in pipes leading from above-ground storage tanks at the truck stop. Based on the test results, WDEQ issued a letter of violation notifying Montana Petroleum that it was

[**] The Honorable Wesley E. Brown, Senior District Judge of the District of Kansas, sitting by designation.

operating in violation of Wyo. Stat. Ann. § 35-11-301(a)(i)-(ii), which states that no person shall "[c]ause, threaten or allow the discharge of any pollution or wastes into the waters of the state" or "[a]lter the . . . properties of any waters of the state" without a permit.

Montana Petroleum promptly advised Federated of the notice of violation. At the time the leak was discovered by Wyoming, Montana Petroleum was insured under both a comprehensive general liability policy and a commercial umbrella liability policy issued by Federated. Federated acknowledged coverage under these policies and paid for additional investigation and monitoring at the site, replacement of the distribution lines, and installation and operation of remediation systems. Montana Petroleum has never conceded liability, wholly or in part, for the contamination at the truck stop, nor has liability been established through adjudication. In fact, in a letter to Federated, Montana Petroleum suggested that a lessee or previous owner of the property might be wholly or partially responsible for the contamination given that its records indicated no significant loss of petroleum.

In 1990 the Wyoming legislature enacted the Water Pollution from Underground Storage Tanks Corrective Action Act of 1990, Wyo. Stat. Ann. §§ 35-11-1414 to -1428 ("Corrective Action Act"). The primary purpose of the Corrective Action Act is to protect Wyoming's groundwater supply from leaking

oil storage tanks while ensuring that state and federally mandated clean-up standards do not bankrupt businesses vital to supplying oil throughout the rural state. See Wyo. Stat. Ann. § 35-11-1414. Towards this end, the Corrective Action Act created a "corrective action account" to pay for the remediation of qualified sites. See Wyo. Stat. Ann. § 35-11-1424(a) and (c). It also gives the State of Wyoming the "right of subrogation to any insurance policies in existence at the time of the release to the extent of any rights the owner or operator may have had under the policy." Wyo. Stat. Ann. § 35-11-1424(h). Although initially limited to underground tanks, the Corrective Action Act was amended in 1994 to cover above-ground tanks as well. See Act of March 20, 1994, ch. 32 § 1, 1994 Wyo. Sess. Laws.

Following that amendment, Federated ceased paying for remediation at the truck stop and offered to pay Wyoming $30,000 in exchange for a release of Federated and Montana Petroleum from liability. Wyoming did not accept the offer. After requesting information concerning Federated's policies with Montana Petroleum, on December 12, 1997, Wyoming sent Federated a letter inquiring if Federated was "willing to complete the remediation that it started at this site." (I Appellant's App. at 225.) When Wyoming did not receive a response, it filed suit on February 26, 1998, seeking a declaratory judgment that it was entitled to indemnification under the policies issued to Montana Petroleum by Federated for

all past and future costs of remediation, damages arising from Federated's denial of coverage, and related relief. Wyoming had spent $68,445.57 on site investigation and monitoring costs as of July 30, 1998, and estimates it will cost an additional $388,268.10 to complete the remediation.

The district court granted Federated's motion for summary judgment and dismissed the suit. It first held that, pursuant to Wyo. Stat. Ann. § 35-11-1424(h), Wyoming has a statutory right of subrogation to Montana Petroleum's policies with Federated, a holding Federated does not challenge on appeal. It then held that Wyoming is not entitled to coverage under the policies because "neither the insured nor the insured's subrogee has a right to sue Federated for coverage until Federated denies a claim under which its insured has been found legally liable," (III Appellant's App. at 748), and Montana Petroleum's legal liability for the contamination has not been established.

In reaching this conclusion, the district court relied primarily on the policies' "no action" clauses:

> No action shall lie against the company unless, as a condition precedent thereto, the Insured shall have fully complied with all the terms of this policy, nor until the amount of the Insured's obligation to pay shall have been finally determined either by judgment against the Insured after actual trial or by written agreement of the Insured, the claimant and the company.
>
> Any person or organization . . . who has secured such judgment or written agreement shall thereafter be entitled to recover under this policy to the extent of the insurance afforded by this policy. Nothing

-5-

contained in this policy shall give any person or organization any right to join the company as a co-defendant in any action against the Insured to determine the Insured's liability.

(II Appellant's App. at 509.) [1] It also relied on the policies' coverage provisions, which obligated Federated to indemnify Montana Petroleum for, inter alia, "all sums which the insured shall become legally obligated to pay as damages because of . . . property damage," (II Appellant's App. at 459 (comprehensive liability policy)), and "all sums which the Insured shall be obligated to pay by reason of the liability . . . imposed upon the Insured by law," (II Appellant's App. at 506 (umbrella liability policy)). At issue on appeal is whether the district court erred in holding that the no action clause bars Wyoming's suit.

## II

Applying Wyoming law, we review the district court's interpretation of the insurance policies de novo, and we will uphold summary judgment only if "the terms of the parties' contract do not raise issues of material fact, the contract language is plain and unambiguous, and the terms of the contract are controlling." Fremont Homes, Inc. v. Elmer, 974 P.2d 952, 955 (Wyo. 1999) (citations

---

[1] The quoted language comes from the umbrella liability policy. The comprehensive liability policy contains a virtually identical no action clause that differs in substance only in that the final sentence of the second paragraph reads as follows: "No person or organization shall have any right under this policy to join the Company as a party in any action against the insured to determine the insured's liability, nor shall the Company be impleaded by the insured or his legal representative." (II Appellant's App. at 401 (emphasis added).)

omitted). This standard incorporates a fundamental precept of Wyoming contract law: "[T]he words used are given the plain meaning that a reasonable person, in the position of the insured, understands them to mean." Doctors' Co. v. Insurance Corp. of Am., 864 P.2d 1018, 1023-24 (Wyo. 1993) (citations omitted).

The district court held, and Federated does not contest, that Wyoming has a statutory right of subrogation. As subrogee, Wyoming succeeds to the rights of Montana Petroleum under the insurance policies; its rights are identical to those of the policyholder. See Stilson v. Hodges, 934 P.2d 736, 738 (Wyo. 1997). At the same time, Wyoming is also the injured party, i.e., the third-party claimant, because the contamination at Montana Petroleum's truck stop allegedly violated its legally enforceable rights and it is seeking to recover costs incurred as a result of that violation. By its own admission, Wyoming seeks "to resolve issues of coverage and liability in one action." (Appellant's Reply Br. at 4.)

On its face, the language of the no action clause is plain and unambiguous: "No action shall lie against the company . . . until the amount of the Insured's obligation to pay shall have been finally determined either by judgment against the Insured after actual trial or by written agreement of the Insured, the claimant, and the company ." (II Appellant's App. at 509; see also id. at 401.) It is undisputed that the amount Montana Petroleum is obligated to pay as a result of the oil leak from its distribution lines has not been determined after trial or by an

agreement. Rather, the existence and extent of liability remains an open question: Federated contends that Montana Petroleum was not solely liable for the contamination at the Buffalo site, and that in any event the contamination for which it might have been liable has been adequately remediated. Therefore, the plain language of the no action clause prohibits an action from being brought against Federated by Montana Petroleum, its subrogee, or any other party until the amount of Montana Petroleum's legal obligation is determined and a claim for indemnification of that obligation is denied by Federated.

Despite this plain language, Wyoming contends that the no action clause does not apply to the insured or the insured's subrogee. Its primary support for this contention is our assertion in Paul Holt Drilling, Inc. v. Liberty Mutual Insurance Co., 664 F.2d 252, 254 (10th Cir. 1981), that "[w]e think the Oklahoma court would hold the no action clause is intended to apply only to claims made by third parties." Wyoming's reliance on this language is misplaced. First, Paul Holt Drilling interpreted Oklahoma law, and therefore does not control when, as here, we are required to apply Wyoming law. Second, Pault Holt Drilling involved the single question of whether the statute of limitations for a claim alleging breach of the duty to defend begins to run as soon as the insured incurs defense expenses as a consequence of the insurer's denial of a request to defend. See id. at 253. In reaching the conclusion that it does, we

first rejected the argument that a no action clause would bar a suit by the insured for breach of the insurer's duty to defend prior to the resolution of the underlying suit. See id. 254-55. Application of the no action clause in that situation, we reasoned, would create an absurd result: "If the no action clause applies to the insureds' claims, when would it no longer bar suit to recover the legal expenses they bear when the insurer wrongfully refuses to defend? Unless insureds refuse to pay their attorney, no judgment for those fees will ever be entered against them." Id.

No such absurd result presents itself when, as in this case, an insured or its subrogee brings suit alleging wrongful refusal to indemnify. Pursuant to the no action clause, Federated's duty to indemnify does not arise until the amount of Montana Petroleum's obligation to pay is established by a qualifying judgment or agreement. As mentioned, that has not yet occurred. By contrast, the no action clause does not impose any conditions precedent on the duty to defend because that duty arises when the insured is served a complaint asserting claims that, if successful, would be covered under the policy, regardless of whether those claims are ultimately successful and the insured becomes obligated to pay. See Reisig v. Union Ins. Co., 870 P.2d 1066, 1068 (Wyo. 1994). Thus, even if Paul Holt Drilling's interpretation of Oklahoma law applies equally to Wyoming law, its

reasoning would not be applicable to this case, which involves the duty to indemnify and not the duty to defend.

We also reject Wyoming's argument that the doctrine of judicial estoppel bars application of the no action clause to Wyoming as subrogee of Montana Petroleum. Under that doctrine, "'[a] party who by his pleadings, statements or contentions, under oath, has assumed a particular position in a judicial proceeding is estopped to assume an inconsistent position in a subsequent action.'" Ex rel. DG, JG & CW v. Natrona County Dep't of Family Servs., 916 P.2d 991, 998 (Wyo. 1996) (quoting In re Paternity of JRW, 814 P.2d 1256, 1265-66 (Wyo. 1991)). "Judicial estoppel does not apply to legal conclusions based on undisputed facts." Id. (citing In re Paternity of SDM, 882 P.2d 1217, 1224 (Wyo. 1994)). Nor does it apply if the prior position was not successful. See id.

In its brief to the New Mexico Supreme Court in the case of Roberts Oil Co. v. Transamerica Insurance Co., 833 P.2d 222 (N.M. 1992), Federated argued that a no action clause "applies only to third-party claims" and cannot be applied to "prevent the insured from asserting a direct claim against the carrier for environmental damages which are covered under the policy." (III Appellant's App. at 594.) This position is not contrary to Federated's argument in the instant case that further remediation at the Buffalo site is not covered under the policy

because the amount of Montana Petroleum's legal obligation to pay has not been determined. Even assuming Federated's position in Roberts Oil is contrary to the argument it makes to this court, that position is a legal argument based on the undisputed and unambiguous language of the insurance policy. Cf. Ahrenholtz v. Time Ins. Co., 968 P.2d 946, 949 (Wyo. 1998) (holding that the interpretation of unambiguous contract language is a matter of law, and ambiguity is not created by a mere difference of position between parties). Moreover, to the extent Federated took the categorical position that a no action clause never applies to the insured, that position was unsuccessful. See Roberts Oil, 833 P.2d at 231 ("[W]e are willing for purposes of this case to accede to the insurers' argument that the no action clause does indeed convert the voluntary payment clause from a promise by the insured to an express condition to the insurer's obligations." (citation omitted)). Therefore, judicial estoppel does not apply.

Wyoming further argues that its suit is not barred by the no action clause because, under Compass Insurance Co. v. Cravens, Dargan & Co., 748 P.2d 724 (Wyo. 1988), and State Farm Mutual Automobile Insurance Co. v. Shrader, 882 P.2d 813 (Wyo. 1994), public policy considerations militate against requiring Wyoming to bring a separate action to establish the extent of Montana Petroleum's liability.

State Farm addressed the question of whether the fault of an uninsured motorist and the amount of damages suffered by the insured can be determined in a single action against the insurer. 882 P.2d at 821-22. The Wyoming Supreme Court concluded that, in order to further the public policy motivating the statutorily mandated uninsured motorist coverage, such an action was permissible. See id.

Unlike in State Farm, we are not confronted with statutorily mandated insurance coverage, but rather a statutorily-created right of subrogation. That is, the Corrective Action Act does not delineate the scope or nature of coverage but simply gives Wyoming the right to recover under existing policies. See Wyo. Stat. Ann. § 35-11-1424(h). Furthermore, the uninsured motorist policy did not predicate coverage on the legal liability of the insured, nor did the court's analysis of that policy mention a no action clause. Rather, the policy covered all damages the insured was "legally entitled" to recover from the uninsured motorist, and neither the policy nor the statute had language prohibiting the insured from establishing the fault of the uninsured motorist and the extent of damages in an action against the insurer. State Farm, 882 P.2d 818, 821-22. As a condition precedent to coverage, therefore, the policy simply required the insured to show that his or her damages were proximately caused by the negligence of an uninsured motorist. See id. at 823. In the instant case, by

contrast, the language of the policy plainly prohibits bringing an action against the insurer until the insured's obligation to pay and the amount of that obligation have been established. The language of the Corrective Action Act does not abrogate those conditions precedent. It explicitly authorizes actions against tank owners who have insurance, not the insurance companies themselves. See Wyo. Stat. Ann. § 35-11-1424(g). Nor can such a statutory intent be read into the subrogation provision, because the right of subrogation is specifically limited to the rights of the policyholder. See Wyo. Stat. Ann. § 35-11-1424(h).

The second case on which Wyoming relies in support of its public policy argument is equally unavailing. In Compass, a vandal opened a valve on an oil storage tank in a Wyoming highway department maintenance yard, causing oil to spill into a drainage ditch and then be carried by water onto adjacent property. 748 P.2d at 726. The highway department promptly cleaned the spill on its property and the adjacent property, without having first been subject to a lawsuit or having entered into a settlement. See id. It then sought indemnification from Compass and Cravens, its liability and property insurers, respectively. See id. Cravens paid the claim and accepted a right of subrogation from the highway department for all claims it might have as a result of the spill. See id. Cravens then brought suit against Compass for reimbursement. See id.

Compass refused, arguing that under the terms of its policy, which included a no action clause substantially similar to the one before us, it had no obligation to pay for the clean-up costs because the highway department had not been sued and was not legally liable for the damages. See id. at 728-29. The Wyoming Supreme Court rejected these arguments. It first held that under the Wyoming Environmental Quality Act and the rules and regulations promulgated thereunder, "a person owning oil which is discharged is responsible for the clean up of the discharged oil" without the need for "a judicial determination of that fact." Id. at 728; see also Wyoming v. Platte Pipe Line Co., 649 P.2d 208, 214 (Wyo. 1982) (holding that an owner of a pipeline that discharges oil is strictly liable for the resulting damages).

Turning to Compass's assertion that the highway department had no legal liability absent the filing of a formal claim, the Wyoming Supreme Court reasoned:

> If the insurer's promise to pay is to be of any practical value, it must include an obligation of good faith and reasonableness. From the beginning, the highway department was in a dilemma. If it did nothing to clean up the oil spill, the damages would be much greater. The damages would be much greater even if it waited only for determinations as to who was liable and who would direct the cleanup. An oil spill into flowing water, by its nature, requires an immediate clean-up response. That no formal claims were filed is a credit to the highway department's clean-up efforts, not an excuse for Compass to deny coverage. The principles of good faith and reasonableness require the insurer, under these circumstances, to acquiesce to the clean-up efforts. Compass has not pointed to any

> detriment which it has suffered from the highway department's actions. <u>Compass stipulated to the damage amounts, and the liability is clear</u>. Compass' coverage was not expanded in any way by the highway department's action. Rather, the highway department's actions limited the damages.

<u>Compass</u>, 748 P.2d at 728-29 (emphasis added).

There are several important distinctions between <u>Compass</u> and the case at bar. Most significantly, Montana Petroleum's liability is not clear. Although <u>Compass</u> establishes that Montana Petroleum is responsible as a matter of law for the clean-up of any of its oil that was discharged, Federated contends that someone other than Montana Petroleum may be responsible for some of the contamination and that the clean-up for which it paid was adequate to remedy the contamination for which Montana Petroleum was legally responsible. No such issues were present in <u>Compass</u>, where the source and extent of contamination were obvious. Similarly, to the extent <u>Compass</u> can be read to hold that a stipulation to damages, instead of a judgment or agreement, is sufficient to satisfy the requirements of a no action clause, that holding does not apply to the facts of this case: Neither Montana Petroleum nor Federated has stipulated to the amount of damages.

Finally, Federated has demonstrated at least a modicum of good faith and reasonableness in its handling of Montana Petroleum's claim. It acquiesced to monitoring and remediation efforts between 1986 and 1994 despite the absence of

-15-

a judgment or settlement. <u>Cf.</u> <u>Chemical Applications Co. v. Home Indemnity</u> <u>Co.</u>, 425 F. Supp. 777, 779-80 (D. Mass. 1977) (finding that an insurer acted unreasonably when it belatedly denied coverage for all work performed by the insured to remediate an oil spill). This response facilitated rather than inhibited Montana Petroleum's compliance with statutory and regulatory provisions mandating prompt containment and clean-up.[2] At issue in this case is whether Montana Petroleum, and by implication its insurer, must pay for additional clean-up. The important policy considerations underlying the holding in <u>Compass,</u> therefore, are not implicated in the particular circumstances of this case.

We have taken as our starting point a basic precept of Wyoming contract law: The language of contracts should be given their plain meaning. <u>See</u> <u>Doctors' Co.</u>, 864 P.2d at 1023-24. <u>Compass</u> establishes a narrow public policy exception to that rule, permitting an action for coverage under a policy with a no action clause when the insured's obligation to pay is clear as a matter of law and the amount of that obligation has been established by stipulation instead of judgment or agreement. 748 P.2d at 728-29. If we adopted Wyoming's position,

---

[2] Wyoming argues that Federated has waived its right to challenge Montana Petroleum's liability because it already made payments based on the 1985 notice of violation. Waiver requires an intentional relinquishment of a known right. <u>See</u> <u>Loftus v. Romsa Constr., Inc.</u>, 913 P.2d 856, 859 (Wyo. 1996). As the district court held, mere payment of past clean-up costs does not demonstrate intentional relinquishment of the right to challenge future costs.

we would effectively vitiate the plain meaning of no action clauses in the context of environmental contamination by eliminating the need for clear legal liability and agreed-upon damages. Because the public policy considerations implicated by the "catch-22" scenario in Compass are not present under the facts of this case, we decline to take such a step.[3]

The judgment of the district court is **AFFIRMED**.

ENTERED FOR THE COURT

Carlos F. Lucero
Circuit Judge

---

[3] The Wyoming legislature could have expressly abrogated the enforceability of no action clauses in this context had it so desired. Other states have done just that. See, e.g., La. Rev. Stat. Ann. §§ 22:655, 22:983(E) (permitting direct action against the insured in general); R.I. Gen. Laws § 27-7-2 (permitting direct action against the insurer where the policyholder is not subject to service of process).