141 F.3d 1176
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
HUGHES AIRCRAFT COMPANY, Plaintiff-Appellant-Cross-Appellee,
v.
CENTURY INDEMNITY COMPANY f/k/a Insurance Company of North
America, Defendant-Appellee-Cross-Appellant.
 Nos. 96-55579, 96-55646.
DC No. CV-93-00275-LGB.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted October 9, 1997.
Decided March 31, 1998.
 
 1
 Appeal from the United States District Court for the Central District of California Honorable Lourdes G. Baird, District Judge, Presiding.
 
 
 2
 Before REINHARDT and TASHIMA, Circuit Judges, and FITZGERALD, District Judge.**
 
 
 3
 MEMORANDUM*
 
 I. Mass. Mutual claims
 
 4
 Hughes Aircraft Company (Hughes) leased property at Fullerton, California for manufacturing operations from 1958 until 1971, when Hughes vacated the site. Massachusetts Mutual Life Insurance Company (Mass.Mutual) purchased the Fullerton site in 1968. Hughes again leased part of the site from 1978 to 1991.
 
 
 5
 Hughes' manufacturing operations used a cleaning and degreasing agent known as trichloroethylene (TCE). Hughes discovered TCE contamination of the Fullerton property in 1986 when three underground tanks (a "clarifier" and two "sumps") containing a hazardous chemical sludge, were excavated and removed. Hughes used TCE in manufacturing operations at the Fullerton property between 1958 and 1971. Hughes reported the contamination to the Orange County Health Care Agency (Agency). The Agency directed Hughes to propose a clean-up plan for the site.
 
 
 6
 In 1988, Hughes hired Hargis and Associates (H & A) to conduct studies and develop a remediation plan. H & A designed a four-phase clean-up program; obtained government approval for the first three phases; and performed substantial clean-up work costing millions of dollars.
 
 
 7
 On August 1, 1991, Mass. Mutual, which still owned the Fullerton site, sued Hughes for damages resulting from the TCE contamination. On February 14, 1992, Catellus Development Corporation (Catellus), owner of property adjacent to the site, sued Hughes for damages said to have occurred from the migration of TCE to the Catellus property.
 
 
 8
 On October 21, 1991, Hughes tendered defense of the Mass. Mutual and Catellus suits[1] to Century Indemnity Company (INA).[2] INA provided insurance to Hughes during all relevant time periods. Hughes also demanded indemnification of the remediation costs incurred or to be incurred by Hughes. On May 26, 1992, INA offered "to participate in the defense of Hughes, on an equitable basis and pursuant to a Defense Agreement, along with all of Hughes' other carriers, subject to a full reservation of rights...."
 
 
 9
 Hughes settled the Mass. Mutual claim in early 1992 by paying Mass. Mutual $11.6 million and taking title to the Fullerton property. In June of 1993, Hughes settled the Catellus lawsuit by paying Catellus $250,000 and by entering into certain contingent agreements with Catellus.
 
 
 10
 On November 12, 1992, Hughes filed a complaint in state court against its insurer, INA. Hughes sought reimbursement of the settlement and defense costs incurred in the Mass. Mutual and Catellus suits and the costs of remediating the groundwater belonging to the State of California. Hughes further alleged that INA breached its covenant of good faith and fair dealing by not defending the Mass. Mutual and Catellus actions and by not indemnifying Hughes for its remediation and settlement costs. INA removed the case to federal court based on diversity of citizenship.
 
 
 11
 In August of 1993, INA moved for summary judgment on all of Hughes' claims. The district court granted INA's motion for summary judgment on Hughes' claims for indemnification of settlement costs incurred in the Mass. Mutual suit, reasoning that the applicable insurance policies excluded coverage for damage to property "used by, occupied by, rented or leased to, or in the care, custody or control of the insured."[3] Having granted INA's motion for summary judgment with respect to Hughes' claim for indemnification for settlement costs, the court also granted INA's motion for summary judgment on Hughes' claims that INA's failure to make such indemnification was a breach of contract and breach of the covenant of good faith and fair dealing.
 
 
 12
 However, the district court denied INA's motion for summary judgment as to Hughes' request for a declaration that INA owed Hughes a duty to defend the Mass. Mutual suit. The court ruled that even though Hughes had no right to indemnification from INA for costs incurred in the settlement of the Mass. Mutual suit, Hughes nonetheless had a right to indemnification for costs incurred in defending the Mass. Mutual claims. The trial court found that because there was at least a potential for coverage under the insurance policy, INA owed Hughes a duty to defend. Moreover, the district court found that INA, through its defense agreement with other insurers, met its duty to defend Hughes. Accordingly, the district court granted INA's motion for summary judgment as to Hughes' cause of action for breach of contract and breach of the covenant of good faith and fair dealing for INA's failure to defend the Mass. Mutual suit. In so doing, the district court found that INA's reservation of a right of reimbursement of defense costs did not constitute a breach of the duty to defend Hughes.
 
 
 13
 The district court also granted INA's motion for summary judgment regarding Hughes' request for a declaration that INA owed Hughes a duty to indemnify Hughes for remediation costs incurred prior to October 21, 1991. The court found that Hughes voluntarily paid remediation expenses, and that such voluntary payments were not subject to indemnification subject to the "voluntary payment provision" found in the applicable INA policies. Having granted INA's motion for summary judgment on Hughes' claim for indemnification for remediation expenses, the district court also granted INA's motion for summary judgment on Hughes' claims for breach of contract and breach of the covenant of good faith and fair dealing regarding INA's failure to indemnify Hughes for remediation costs.
 
 
 14
 Hughes appeals the district court's grant of summary judgment against Hughes on its claims for recovery of Mass. Mutual defense costs. Hughes' also appeals the court's grant of summary judgment against Hughes on its claim for "voluntary" remediation costs incurred prior to October 21, 1991, the date when Hughes tendered defense of the Mass. Mutual and Catellus lawsuits. Additionally, Hughes appeals the district court's grant of summary judgment against Hughes on its claims of breach of the covenant of good faith and fair dealing based on INA's failure to defend and indemnify Hughes.
 
 
 15
 An order granting summary judgment is reviewed de novo. Bagdadi v. Nazar, 84 F.3d 1194, 1197 (9th Cir.1996). In reviewing a grant of summary judgment, we must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Id.
 
 
 16
 1. Did the district court err by granting summary judgment in favor of INA on Hughes' cost of defending the Mass. Mutual suit?
 
 
 17
 Although the district court found that INA had no duty to indemnify Hughes for its settlement costs, the court also found that there was at least a potential for coverage under the insurance policies and, therefore, that INA owed Hughes a duty to defend the Mass. Mutual suit. Gray v. Zurich Ins. Co., 65 Cal.2d 263, 419 P.2d 168, 58 Cal.Rptr. 104 (1966). The district court went on to find that INA met its duty to defend the Mass. Mutual claims by agreeing to share in the defense costs with other insurers. The district court also ruled that INA's reservation of a right to seek reimbursement from Hughes for defense costs, if it was later determined that the claims were not covered by the policies, did not breach the duty to defend.
 
 
 18
 As the district court found, the leases covering Hughes' rental of the Fullerton property between 1958 and 1971, the time period during which TCE was used at the site, required Hughes to purchase insurance for the property for the benefit of the lessor, Mass. Mutual. The INA policies purchased by Hughes ran from January 1, 1965 to January 1, 1970. The district court concluded that the Fullerton property was owned by Mass. Mutual and leased to Hughes during the relevant time period and that the INA policies plainly excluded coverage for damage to property which Hughes leased, occupied, and used in Fullerton. Based on the policy language, the district court could have found that INA had no duty to defend Hughes in the Mass. Mutual action. An insurer owes a duty to defend even where coverage is in doubt, Haskel, Inc. v. The Superior Court of California, 33 Cal.App.4th 963, 978, 39 Cal.Rptr.2d 520 (1995). Here, however, there is no doubt that the insurance polices which Hughes purchased for the benefit of Mass. Mutual excluded damage to the Fullerton property. Thus, under the INA policies, there was no potential for coverage of Hughes' claims involving the Fullerton property. The district court failed to explain why it believed a potential for coverage existed.
 
 
 19
 Although, as noted above, the district court found that there was at least a potential for coverage under the policies and, therefore, that INA owed Hughes a duty to defend the Mass. Mutual suit, we may affirm the district court on any basis supported by the record. Shaw v. California Depot. of Alcoholic of Beverages Control, 788 F.2d 600, 603 (9th Cir.1986). Accordingly, because INA neither owed nor breached a duty to defend Hughes with respect to the Mass. Mutual claims, the district court correctly granted summary judgment to INA on this claim.
 
 
 20
 2. Did the district court err in granting summary judgment against Hughes on its claim for "voluntary" remediation costs incurred by Hughes prior to October 21, 1991?
 
 
 21
 The voluntary payment clause in the applicable policy provides that the insured "shall not, except at its own costs, voluntarily make any payment, assume any obligations, or incur any expenses...." Hughes argues that it received "unequivocal directives" from the government to remedied the site. In a letter from the Orange County Health Care Agency, Hughes was directed to develop and submit a site assessment plan respecting the TCE contamination at Fullerton. The letter did not, however, direct or order Hughes to remedied the site. Rather, the letter directed Hughes to submit proposals for site remediation to the Agency for approval. Hughes' decision to remedied prior to tendering the defense to INA on October 21, 1991 was voluntary within the meaning of the voluntary payment clause.
 
 
 22
 Hughes argues that INA must show "actual and substantial prejudice" to deny a payment under the voluntary payment clause, yet the cases Hughes cites in support of this argument address a "cooperation clause" or "notice clause" which are not at issue here. See Billington v. Interinsurance Exchange of S. California, 456 P.2d 982, 987, 79 Cal.Rptr. 326, 71 Cal.2d 728 (1969); Abrams v. American Fidelity & Cas. Co., 195 P.2d 797, 799-800, 32 Cal.2d 233 (1948). The only case which supports Hughes' argument is a New Mexico case which is not relevant to and does not control the present California case. See Roberts Oil Co. v. Transamerica Ins. Co., 833 P.2d 222, 133 N.M. 745 (1992).
 
 
 23
 We noted in Faust v. The Travelers, 55 F.3d 471 (9th Cir.1995) that "California courts have consistently honored voluntary payment provisions ... [plaintiff] does not cite any California authority, and this court is aware of none, that imposes a prejudice requirement for enforcement of the provision." Id. at 472 (citation omitted).
 
 
 24
 The district court correctly ruled that Hughes could not recover voluntary payments made before October 21, 1991.[4]
 
 
 25
 3. Did the district court err in ruling that INA did not breach the covenant of good faith and fair dealing?
 
 
 26
 We have carefully reviewed the record in this case, and agree with INA that Hughes waived the bad faith claim with respect to Mass. Mutual by failing to mention it until after the Mass. Mutual claims were dismissed from the lawsuit on January 18, 1994. See Pierce County Hotel Employees v. Elks Lodge, 827 F.2d 1324, 1329 (9th Cir .1987) ("Issues not preserved in the pretrial order are eliminated from the action."). The district court did not err in denying Hughes' bad faith claim with respect to Mass. Mutual.
 
 II. THE CATELLUS CLAIMS
 
 27
 Catellus brought claims against Hughes on February 14, 1992. According to Catellus' claims, TCE migrated from the Fullerton property to the adjacent property owned by Catellus. Previously, on October 21, 1991, when Hughes tendered the defense of the Mass. Mutual claims to INA, Hughes also tendered the defense of the expected claims from Catellus. On June 18, 1993, Hughes settled the Catellus claim for $250,000 and entered into various tolling agreements to preserve certain claims. On November 12, 1992, Hughes filed a claim against INA for indemnification of the settlement payments and defense costs incurred in the Mass. Mutual & Catellus lawsuits.
 
 
 28
 INA then moved for summary judgment against Hughes, and the district court entered an order on February 10, 1994. According to the evidence offered at the hearing, the court found that the contamination of the Fullerton property might have originated from several sources. The potential sources included the underground clarifier removed from the Fullerton property in 1986, two TCE spills allegedly caused by vandalism occurring on the Fullerton property in the mid 1960s, and surface discharge of TCE which occurred in the use of Hughes' equipment and spills caused by Hughes' employees through 1971. The INA insurance policies provided coverage to Hughes from January 1, 1965 to January 1, 1970. The central issue to be determined regarding the Catellus claims was whether the contamination migrated from the Fullerton property to the Catellus property within the relevant policy periods.
 
 
 29
 The district court initially found on the basis of testimony by Hughes' expert witness David Hargis and other testimony, that a factual issue existed as to when the contamination migrated to the Catellus property and whether this occurred during the relevant policy periods. Accordingly, INA's motion for summary judgment on Hughes' claim for indemnification for its settlement with Catellus was denied. The district court also held that INA, in its letter to Hughes offering to defend the Mass. Mutual claims had failed to mention the Catellus claims. In view of the potential liability, the district court held that INA had breached its duty to defend Hughes against the Catellus claims. Thus, the district court denied INA's motion for summary judgment on Hughes' claims against INA arising out of INA's failure to defend the Catellus' claims.
 
 
 30
 A pretrial conference was held on October 3, 1994. At that time, INA disclosed its intentions to present a motion in limine to strike David Hargis from Hughes' witness list because of wilful destruction of evidence. The district court ordered trial on the remaining issues for December 5, 1994. However, on November 28, 1994, INA filed a trial brief requesting a continuance of the trial and renewal of its motion for summary judgment on Hughes' claims of indemnification arising out of the settlement of the Catellus litigation. The trial was not held.
 
 
 31
 On January 17, 1995, the district court granted INA's renewed motion for summary judgment on Hughes' remaining claims for indemnity arising out of the Catellus lawsuit. Relying upon Chemstar v. Liberty Mut. Ins., 41 F.3d 429 (9th Cir.1994), cert. denied, 517 U.S. 1219, 116 S.Ct. 1847, 134 L.Ed.2d 948 (1996), the district court adopted the "manifestation trigger" rule relating to third party claims involving insurance coverage. The "trigger issue" involves determining the operative event that activates the insurer's obligations under its policy of insurance. The district court held that:
 
 
 32
 Applying the manifestation trigger to this case compels entry of summary judgment in favor defendant INA. To wit, the Court has previously found that the TCE contamination at issue manifested itself upon removal of the clarifier in 1986 and thus outside of the period of coverage afforded by INA's policies, which ran from January 1, 1965 to December 31, 1969.
 
 
 33
 After granting INA's motion for summary judgment on Hughes' remaining claims for indemnity,[5] the court concluded that triable issues remained regarding INA's duty to defend Hughes in the Catellus action.
 
 
 34
 The parties filed cross-motions for summary judgment on the issue of whether INA had breached its duty to defend Hughes against the Catellus claims. On April 18, 1995, the district court, after reviewing numerous pieces of correspondence between the parties, determined that INA breached its duty to defend Hughes against the Catellus claims.
 
 
 35
 The district court then heard arguments with respect to Hughes' damages, and on June 1, 1995, awarded Hughes for $150,814.96 in damages for INA's contractual breach of the duty to defend Hughes from the claims asserted in the Catellus action.[6] The district court also entered summary judgment in favor of INA on all of Hughes' unresolved claims for remediation expenses. Finally, the district court entered summary judgment in favor of INA on Hughes' claim for bad faith based on INA's breach of its duty to defend Hughes in the Catellus action. The district court directed that no claims remained to be adjudicated in the litigation and final judgment was entered.
 
 
 36
 In the meantime, the California Supreme Court, in Montrose Chem. Corp. v. Admiral Ins. Co., 42 Cal.Rptr.2d 324, 913 P.2d 878, 10 Cal.4th 645 (1995) rejected the "manifestation trigger" enunciated in Chemstar. Consequently, Hughes filed a motion to alter or amend the judgment of January 20, 1995, in which the court adopted the "manifestation trigger." On August 14, 1995, the district court granted Hughes' motion, and set aside its order granting summary judgment to INA on the Hughes' claim for indemnity. The district court then ordered the parties to prepare for trial on the indemnification issue.
 
 
 37
 Once again, the district court was compelled to address INA's motion to strike David Hargis as a witness for Hughes. On November 13, 1995, the matter came on for hearing before the district court. After considering the evidence, the district court found that documents such as contour maps were created in connection with the work of Hargis during the preparation of a modeling study. INA made timely demand for these documents but the documents had been destroyed. The district court found the destruction of documents to be in bad faith, intentional, or at least in reckless disregard and highly prejudicial to INA. The district court rejected a dismissal of the Hughes' claim of indemnity, but justified the striking of Hargis' testimony with regard to the computer models.
 
 
 38
 In an order dated December 5, 1995, the district court entered comprehensive findings of fact and conclusions of law. The court granted in part INA's motion to strike David Hargis from the witness list of Hughes. The court prohibited Hargis from testifying as to any opinions or conclusions regarding the contamination of the Catellus property or regarding any contour maps or computer models. However, Hargis would be permitted at trial to testify as a percipient witness of contamination which he observed in the summer of 1988, when Hargis began working for Hughes. The trial judge also required Hughes to file an offer of proof as to Hargis' testimony in conformance with the court's order.
 
 
 39
 Hughes filed its offer of proof on December 8, 1995, setting forth the areas in which Hargis would provide testimony at trial. INA promptly filed objections and the district court reviewed Hargis' proposed testimony as set forth in the offer of proof. The court issued its order on February 5, 1996, holding that Hughes' offer of proof failed to comply with the court's December 5, 1995 order prohibiting Hargis from giving expert testimony. Since Hughes in its offer of proof failed to disclose proposed testimony by Hargis as a percipient fact witness, the trial court sustained INA's motion to strike Hargis as a witness for Hughes. Indeed the proposed testimony outlined in Hughes' offer of proof reflected in large part testimony given by Hargis in conjunction with Hughes' opposition to INA's motion for summary judgment heard by the court on November 13, 1995.
 
 
 40
 INA then filed a motion for summary judgment. In response to the motion, Hughes argued, contrary to the position that it had maintained throughout the litigation, that expert testimony was not necessary to raise a genuine issue of material fact as to the timing of subsurface contamination. In its order of March 18, 1996, the court exhaustively reviewed the course of the litigation. After discussing the inconsistent positions taken by Hughes, the trial court held that Hughes was now judicially estopped from asserting that expert testimony was not necessary to raise a genuine issue of fact as to the timing of subsurface contamination of the Catellus property.
 
 
 41
 Turning to the other arguments offered by Hughes in opposition to INA's motion for summary judgment, the trial court found that Hughes had offered testimony of two major spills of TCE during the mid 1960s on the Fullerton property. In addition, Hughes submitted other testimony concerning the properties of TCE to support its claim that TCE contaminated the groundwater at the Fullerton site during the INA policy periods. The witnesses offered in support of the timing of the subsurface contamination of the Catellus property included the testimony of six witnesses expressing opinions of scientific and engineering fact that large volumes of pure TCE product would penetrate soils like those found at Fullerton and enter the groundwater within a matter of months to a couple of years. The district court held that under the Federal Rules of Evidence, testimony of the witnesses named by Hughes regarding the properties of TCE is within the subject of expert testimony. Since none of these witnesses had been designated as experts by Hughes, INA's objections to the testimony of this group of witnesses was granted. The court then entered final judgment, and this appeal followed.
 
 
 42
 Hughes contends on appeal that the district court abused its discretion by imposing sanctions which essentially defaulted Hughes on its indemnification claims. Hughes also argues that the district court incorrectly held that INA did not breach the covenant of good faith and fair dealing.
 
 
 43
 INA contends on appeal that the district court's ruling on defense costs are moot because Hughes has collected 100% of the defense costs it seeks in this action from another insurance carrier. INA also contends that the district court erred in concluding that INA did not offer to defend Hughes in the Catellus action.
 
 
 44
 1. Did the district court err by sanctioning Hughes and striking the opinion testimony of its expert?
 
 
 45
 The district court's choice of sanctions is reviewed for an abuse of discretion. Stars' Desert Inn Hotel & Country Club, Inc. v. Hwang, 105 F.3d 521, 524 (9th Cir.1997); United States v. Wunsch, 84 F.3d 1110, 1114 (9th Cir.1996).
 
 
 46
 The district court has authority to impose sanctions for abuses of the discovery process under Rule 37 of the Federal Rules of Civil Procedure. Wanderer v. Johnston, 910 F.2d 652 (9th Cir.1990). Where a discovery abuse involves use of an expert witness, the district court has authority to preclude such expert from testifying if the expert's testimony "is in bad faith or would unfairly prejudice an opposing party." Campbell Indus. v. M/V Gemini, 619 F.2d 24, 27 (9th Cir.1980) (citation omitted).
 
 
 47
 The district court recognized that striking Hargis was tantamount to a default judgment in favor of INA. In Wanderer, we set out several factors for the district court to apply in considering whether a dismissal or default was appropriate as a Rule 37 sanction. The district court must consider:
 
 
 48
 (1) the public's interest in expeditious resolution of litigation; (2) the court's need to manage its dockets; (3) the risk of prejudice to [the party seeking sanctions]; (4) the public policy favoring disposition of cases on their merits; and (5) the availability of less drastic sanctions.
 
 
 49
 Wanderer, 910 F.2d at 656 (citations omitted).
 
 
 50
 "While a district court need not make explicit findings regarding each of these factors, if it does not, the appellate court must review the record independently to determine whether the sanction was an abuse of discretion." Id. (citations omitted).
 
 
 51
 Here, the district court entered findings that the destruction of Hargis' work product was intentional, willful, and done in bad faith. The court found that the destroyed electronic data and contour maps were documents identified in INA's document production request and subpoena. The court found that the documents which Hargis destroyed, including all iterations of his computer model, were plainly relevant and should have been preserved. Finally, the court found that the destruction of Hargis' work product caused substantial, material prejudice to INA. The district court then stated as follows:
 
 
 52
 In light of the fundamental link between Hargis' final computer model and the entirety of his expert work in this case, the most narrowly tailored sanction sufficient to remove the prejudice to INA is an order prohibiting Hargis from testifying at the trial of this action as to any opinions or conclusions....
 
 
 53
 Our review of the record supports the district court's decision. The document request specifically directed Hughes to preserve and produce all documents, including electronic data, that he relied on for his testimony, and all documents "used in any manner, or reviewed or relied upon by Hargis...." Hughes argues that it produced 200,000 pages of other documents, but it was Hughes' duty to produce documents that INA reasonably thought were relevant or would lead to relevant evidence. See Fed.R.Civ.P. 26(a)(2)(B) (requiring a party to disclose all data and other information considered by an expert).
 
 
 54
 Hughes' chief argument is to analogize document destruction with word processing edits. Yet INA's expert Yaron Sternberg, whom the district court found to be credible, stated that computerized groundwater modeling cannot be compared to word processing. When Hargis destroyed the input and output from nearly all of his first 149 experiments, he denied INA the opportunity to test his results. See Bartley v. Isuzu Motors, Ltd., 151 F.R.D. 659, 660-661 (D.Colo.1993) ("When one party seeks to present a computer study, in order to defend against the conclusions that are said to flow from these efforts, the discovering party not only must be given access to the data that represents the computer's work product, but he also must see the data put into the computer, the programs used to manipulate the data and produce the conclusions, and the theory or logic employed by those who planned and executed the experiment. All of the information used in generating the computer simulations is relevant to Defendants' challenge of this evidence, not merely the information which conforms to Plaintiff's theory of the case.") (citations omitted).
 
 
 55
 The district court's finding that Hughes acted in bad faith is supported by the record. Hughes was aware of the document requests, destroyed the documents after the request, the destruction was not the result of inadvertence, the destroyed material was relevant, and the destruction was not an isolated incident. Hughes' argument that such destruction is standard practice among consulting hydrogeologists is not supported in the record. In any event, the district court found credible Sternberg's testimony that he needed the destroyed documents to determine if Hargis used reasonable assumptions in arriving at his final conclusions.
 
 
 56
 The record also supports the district court's conclusion that "[t]he destruction of Hargis' work product caused substantial, material prejudice to INA." The district court found Sternberg to be a credible witness, and his testimony supports the district court's finding that the destroyed data was critically important in determining the validity of Hargis' model and conclusions and in providing a meaningful opportunity to cross-examine Hargis.
 
 
 57
 Based on a review of the record, we find that the district court's decision to strike Hargis' expert opinions was not an abuse of discretion.
 
 
 58
 The district court's subsequent decision to exclude Hargis as a fact witness was also not an abuse of discretion. Hargis' proposed "fact" testimony was in fact expert testimony about the chemistry and physics of TCE and general principles of hydrogeology. The district court also correctly noted that Hargis could not testify as a percipient witness because Hargis never observed the geology or hydrology of the area.
 
 
 59
 Finally, it was not an abuse of discretion for the district court to exclude the expert testimony of Hughes' five substitute witnesses, who had not been designated to give opinion testimony or designated as experts. Early in the case, Hughes argued that it could not prove its claims without expert testimony. Subsequently, Hughes argued that expert testimony was not necessary to prove the timing of subsurface contamination. As noted by the district court, the doctrine of judicial estoppel bars a party from taking inconsistent positions in the same litigation. Morris v. State of California, 966 F.2d 448, 452 (9th Cir.1991). In any event, the district court has considerable discretion in concluding that Hughes had forgone the right to designate these witness, as the deadline for designating expert witnesses had passed.
 
 
 60
 For the above reasons, we find that the district court's sanction of Hughes was not an abuse of discretion. Default and dismissal are proper sanctions in view of willful destruction of documents and records that deprived INA of the opportunity to present critical evidence on its key claims to the jury. See National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976); Professional Seminar Consultants, Inc. v. Sino American Technology Exchange Council, Inc., 727 F.2d 1470 (9th Cir.1984).[7]
 
 
 61
 2. Did the district court err in holding that INA did not breach the covenant of good faith and fair dealing with respect to the Catellus claims?
 
 
 62
 We have reviewed the joint pretrial order. None of the issues of law identified in Hughes portion of the join pretrial order asserts a claim of bad faith based on failure to defend the Catellus claims. "Issues not preserved in the pretrial order are eliminated from the action." Pierce, at 827 F.2d 1329. The district court did not err in denying Hughes' bad faith claim regarding the Catellus property.
 
 
 63
 3. Did the district court err in ruling that INA did not offer to defend Hughes in the Catellus action?
 
 
 64
 The district court ruled that INA breached its duty to defend Hughes with respect to the Catellus action. In reaching its conclusion, the district court interpreted 13 pieces of correspondence exchanged by the parties from August 15, 1991 to December 17, 1992, and was unable to find any offer by INA to defend Hughes in the Catellus action. The court found numerous references to the Mass. Mutual litigation, but nothing which could be read as an offer of a defense against Catellus. The court construed the letters in favor of Hughes, and granted summary judgment against INA on the issue. Montrose Chem. Corp. of California v. Superior Court, 6 Cal.4th 287, 300, 861 P.2d 1153, 24 Cal.Rptr.2d 467 (1993).
 
 
 65
 On appeal, INA argues that Hughes and INA consistently treated all claims arising out of the Fullerton contamination as a single claim for insurance purpose, and that every piece of correspondence deals with the claims interchangeably. INA argues repeatedly that Hughes referred to the "Fullerton claims" which was meant to refer to both the Mass. Mutual and Catellus actions.
 
 
 66
 We find nothing in the record which establishes that INA offered to defend Hughes in the Catellus action. Hughes' mere reference to the "Fullerton claims" proves little, and certainly does not show that INA met its duty to defend the Catellus claim.
 
 
 67
 The district court did not err in deciding that INA breached its duty to defend Hughes in the Catellus action.
 
 
 68
 INA contends, however, that when Hughes settled with another one of its insurers, Beagle & Company, Beagley agreed to pay 100 percent of the cost of defending the Catellus claim, and that the right to seek contribution from other carriers for those defense costs was retained by Beagley. We believe that this issue should be addressed by the district court in the first instance. This action is, therefore, remanded to the district court for the sole question of whether Hughes' claim for defense costs is barred by the settlement in Hughes Aircraft Co. v. Beagley et al., No. BC 062120.[8]
 
 
 69
 AFFIRMED AND REMANDED.
 
 
 70
 REINHARDT, J., concurring in part and dissenting in part.
 
 
 71
 I concur in the majority disposition except for its affirmance of the sanctions that resulted in a default judgment for INA with respect to the Catellus claims. Although I have serious questions with respect to the district court's finding that the destruction of Hargis' work product was in bad faith, I agree that we must accept that finding. It does not seem likely, however, that an expert hydrologist and hydrogeologist would deliberately destroy information that he knew 1) would be important in the testing of his model and 2) the other party had a right to obtain. Hargis' failure to retain interim models was an immediately apparent act that could in no way be concealed from the other side and would certainly not constitute a risk worth taking if Hargis thought it violated a discovery request. Nevertheless, I agree that we must accept the district court's finding of bad faith.
 
 
 72
 I do not agree, however, that the district court's sanctions were appropriate under the circumstances. The district court and the majority both recognized that the court's ruling was in effect a default judgment. I believe that there were a number of less drastic alternatives that would have allowed the claims to be disposed of on the merits without prejudice to INA, under the principles set forth in Wanderer v. Johnston, 910 F.2d 652, 656 (9th Cir.1990). The possibilities included allowing Hargis to give expert testimony to a limited extent, requiring Hughes to recreate a sufficient number of interim models to allow INA to test the model, and allowing Hughes to designate other experts in lieu of Hargis. Financial sanctions that would have avoided any economic prejudice to INA could have been imposed as well. The penalty that was imposed as a result of the sanction is normally reserved for the most extreme of cases. See id. at 653 (finding "[t]he severe sanction of default was justified by the defendants' repeated and inexcusable obstruction of every type of discovery attempted by the plaintiffs"). Because this is far from an extreme case and because less drastic sanctions were available, I believe that the district court abused its discretion. Accordingly, I would reverse and remand with respect to the Catellus indemnification claims. See Porter v. Martinez, 941 F.2d 732, 733 (9th Cir.1991) (vacating order of dismissal when less drastic measures, such as allowing plaintiff time to comply with discovery requests, were available).
 
 
 
 **
 Honorable James M. Fitzgerald, Senior United States District Judge for the District of Alaska, sitting by designation
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit, except as provided by Ninth Cir.R. 36-3
 
 
 [1]
 Hughes apparently was on notice that Catellus planned to file suit
 
 
 [2]
 Century Indemnity Company is the successor to Insurance Company of North America (INA), holder of the insurer's rights, and bearer of the insurer's obligations under the policies originally issued by INA and at issue in this action. Throughout the litigation and appellate briefing, Century Indemnity Company has been referred to as "INA."
 
 
 [3]
 The policies provided in pertinent part:
 This policy does not apply ... with respect to Insured Agreement II, to injury to or destruction of (a) property owned by the Insured, ... (c) property used by, occupied by, rented or leased to, or in the care, custody or control of the Insured to the extent the Insured is under contract to provide insurance therefor.
 The district court concluded that clauses (a) and (c) above excluded damage to the Fullerton property. The district court noted that the leases covering Hughes' rental of the Fullerton property between 1958 and 1971, required Hughes to purchase insurance for the property for the benefit of the lessor. Relying upon clauses (a) and (c), the district court concluded that the INA policies excluded damage to the Fullerton property because the property was leased to Hughes between 1965 and 1970, and because the property was owned by Mass. Mutual (Hughes' lessor) during this period.
 
 
 [4]
 The same ruling applies regarding voluntary remediation costs involving the Catellus property
 
 
 [5]
 Specifically, the trial court held that INA had no duty to indemnify Hughes regarding the Catellus action and that INA did not breach its contract or the covenant of good faith and fair dealing regarding indemnification of Hughes for the Catellus claims
 
 
 [6]
 This sum represents the amount of attorney's fees Hughes incurred in relation to the Catellus claims
 
 
 [7]
 Hughes argues that even if the sanction was appropriate, the district court still erred in granting summary judgment on Hughes's coverage claim. The district court had previously found that a jury could reasonably infer that TCE spills contaminated the Catellus property during the coverage period. As noted above however, Hughes had originally contended that expert evidence was necessary to raise a genuine issue of material fact, and the sanctions prohibited Hughes' experts from testifying. Hughes argues, however, that it had eyewitness testimony of TCE spills during the coverage period. The district court found that even if spills occurred during the policy period, there was insufficient evidence, given the lack of expert testimony, to establish that TCE contaminated the groundwater during the policy period. The district court also noted that after INA moved for summary judgment on all remaining issues, Hughes was on notice to that the question of surface contamination at Catellus must be revisited. However, Hughes did not renotice its Statement of Supplemental Facts
 In Unigard Sec. Ins. v. Lakewood Eng'g & Mfg. Corp., 982 F.2d 363 (9th Cir.1992), we held that summary judgment was appropriate where a sanction striking expert witnesses left the plaintiff unable to put forward a prima facie case. The striking of Hargis left Hughes unable to put forward a prima facie case, and the district court's summary judgment was not error.
 
 
 [8]
 INA filed a motion to take judicial notice of the Superior Court jury instruction in Beagley and Hughes does not oppose the motion. The motion is granted